**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| BRIAN EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 7:20-CV-00003-WLS |
| | ) | |
| TIFT REGIONAL HEALTH | ) | |
| SYSTEM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

COMES NOW Defendant, Tift Regional Health System, Inc. (hereinafter "Tift"), by and through undersigned counsel pursuant to Local Rule 56, and in support of its Motion for Summary Judgment, submits its Statement of Material Facts as to which Defendant contends there is no genuine issue to be tried, as follows:

1. Tift is a not-for-profit healthcare system that serves as a regional referral center for all of South Central Georgia.  It provides a wide range of care with more than one hundred physicians, employing over seventeen hundred individuals, making it Tift County's single largest employer and health care provider.  (Lori Folsom Deposition, January 28, 2021, 24:1-3, Exhibit 3, Declaration of Lori Folsom, June 18, 2021, ¶3).

2. In 2018 and 2019, Tift's Food and Nutrition Services ("FANS") Department underwent significant managerial and process changes in order to rectify departmental inefficiencies. (Anthony Laub Deposition, March 4, 2021, 23:17-20, 24:5 – 25:19; Folsom Decl. ¶8).

3. As part of this initiative, Tift contracted with Soriant, who provided a contractor to act as an interim director of the department, until Tift could hire a new and permanent director.

1

7443963v.1

In June of 2018, Anthony Laub began working in the Tift FANS department as the contractor assigned to help with these various improvements and plans. (Laub Dep. 15:19-21, Exhibit 24, 20:1-14, 23:17-20, 25:3-6; Folsom Decl. ¶8).

4. Mr. Laub assisted in addressing and improving many issues facing the department, including reducing waste and costs, realigning roles and job responsibilities, and providing leadership and structure. (Laub Dep. 15:19-21, Exhibit 24, 23:17-20, 25:17-19, 28:14, 29:24 – 30:3; Folsom Decl. ¶8).

5. During this time, the FANS department suffered a lot of issues concerning employee absenteeism, abandonment of positions, and position vacancies, to the point that they were regularly short-staffed. (Kelly Fullum Deposition, February 11, 2021, 10:12-17, 35:22 – 36:3, 42:15-23, 59:16-18, 60:16-21; Steven Harper Deposition, February 11, 2021, 45:18-19, 46:21-25, 47:3-4).

6. In January of 2019, Plaintiff -- an African-American male, applied for a Food Service Aide/Assistant[1] position in the FANS department at Tift. (Plaintiff's Deposition, December 8, 2020, 19:17-18, Exhibit 3, 24:9-12, 26:6-11).

7. Plaintiff interviewed for the Food Service Aide position with Kelly Fullum and Anthony Laub. On February 8, 2019, he was hired for the position. (Laub Dep. 64:7-65:4; Pl's. Dep. 26:22-23, Exhibit 5, 27:6-8, 111:1-9, 111:23 – 112:10; Fullum Dep. 65:23 – 66:1, 92:18-20).

8. In February of 2019 – at the time of Plaintiff's interview and employment, Kelly Fullum was the FANS Department Director for Tift. Ms. Fullum was hired in October of 2018. During this time, Steven Harper was the Supervisor of the sanitation department with

---

[1] Aide and Assistant are used interchangeable throughout depositions and exhibits.

FANS and Plaintiff's direct supervisor. (Pl.'s Dep. 27:11-13, 33:12-17, 59:22-23, 114:13; Laub Dep. 11: 24 – 12:13, 20:1-14; Fullum Dep. 5:24 – 6:3, 6:21 – 7:1, 7:9-16, 68:12-18; Harper Dep. 9:13-16, 9:18-25, 10:6-7, 12:22 – 13:1, 14:2-4; Folsom Decl. ¶¶ 7,8).

9.  Kelly Fullum made the decision to hire Plaintiff as a Food Service Assistant. (Pl.'s Dep. 26:19-21; Folsom Decl. ¶11).

<div align="center">Tift Policies and Procedures</div>

10. Tift is an equal opportunity employer and has a policy against discrimination, harassment, and retaliation. Tift has a reporting policy for complaints. (Folsom Dep. 19:9, Exhibit 2 pp. 2, 11, 24:3, Exhibit 3 p.7).

11. Human resources is responsible for receiving and investigating employee complaints, such as discrimination or harassment. Generally, when HR receives a complaint from an employee, it is documented, evaluated and an investigation of the complaint commences. At the conclusion of the investigation, appropriate measures are recommended and taken, and the investigation is concluded. (Folsom Decl. ¶5).

12. Upon hire, Plaintiff underwent orientation training starting on February 11, 2019, and lasting several days, where he was educated on and given copies of Tift policies and procedures. Defendant's time clock procedures were also reviewed with Plaintiff during orientation.  (Pl.'s Dep. 28:8-12; 28:25 – 29:7, Exhibit 6, 29:21-23, 30:13-17, Exhibit 8, 32:12-14; Fullum Dep. 7-8, Exhibit 10).

13. Plaintiff signed and acknowledged receiving Tift Regional's Employee Handbook, where the one hundred twenty day probationary period for new employees is outlined, as well as the importance of attendance and punctuality. (Pl.'s Dep. 30:5-24, Ex. 8; Folsom Dep. 24:1-3, Ex. 3, pp. 9-12).

14. Tift's Attendance and Punctuality policy in the Employee Handbook states that regular attendance and reporting to shifts on time are extremely important to patient care, and is an essential function of a Tift employee's job. The policy further states that being punctual entails being at the work station at the start of the shift and working until the shift is over. An employee was expected to report their tardiness or absence at least two hours prior to the start of their scheduled shift to a supervisor.  (Folsom Dep. 24:1-3, Ex. 3, p. 11).

15. The Conduct policy in the Employee Handbook explains the standards of behavior that are expected of Tift employees. It also enumerates conduct that is not acceptable and may be grounds for disciplinary action to discharge, "depending upon the facts of the particular case and the employment history of the person involved." (Folsom Dep. 24:1-3, Ex. 3, pp. 28-29).

16. The improper conduct or improper work performance listed that is subject to disciplinary action and/or termination under the Conduct policy, includes: insubordination, refusal to complete assigned shift or walking off from the work station without approval of an immediate supervisor, smoking on Tift property, neglecting work, failing to remain at the employee's work area until the end of the shift, and excessive absenteeism or tardiness. (Folsom Dep. Ex. 3, pp. 28-29).

17. In the first one hundred twenty days of employment, Tift considers this period as a trial or introductory time period.  During this time period, a new Tift employee may be terminated without documentation or additional notice, if his job performance or work habits are deficient, or there is no immediate improvement. (Harper Dep. 62:24 – 63:1; Folsom Dep. 24:1-3, Ex. 3, pp. 9-12, 55:1-7; Folsom Decl. ¶4).

18. Plaintiff was aware that he would be evaluated during his trial period, in which management would assess his job performance, punctuality, and overall interest in continuing to work at Tift, as Tift's expectation was for new employees to make their best effort in their new employment and demonstrate ability and interest in their work. (Pl.'s Dep. 27:24 – 28:4; Folsom Dep. 24:1-3, Ex. 3, pp. 9-10; Folsom Decl. ¶4).

19. The FANS department had a "call in policy," implemented by Ms. Fullum, in order to combat being short-staffed. The call in requirement for employees scheduled a call in shift was to call in between 8:00/8:30 a.m. to verify whether or not they needed to come in to work the shift.  Employees would be notified of their scheduled shifts from a schedule posting in the department. (Fullum Dep. 59:16 – 60:8, 60:16-21, Harper Dep. 45:17-25, 46:1-4, 54:8 – 55:2; Pl.'s Dep. 35:4-7, 37:16-24, 135:22-25).

20. To clock in and out of their shifts, employees would slide their timecards through a clock box on the wall. (Pl.'s Dep. 38:2-3; Fullum Dep. 32:14-24).

<div align="center">Plaintiff's Employment with Tift</div>

21. After completing orientation, Plaintiff was first assigned to the stockroom of the FANS department, where he was tasked with unloading delivery trucks. (Pl.'s Dep. 33:18-20; Harper Dep. 13:15-19).

22. Less than a week after beginning work in the stockroom, Kelly Fullum and Steven Harper were receiving complaints from other supervisors and coworkers regarding Plaintiff's work ethic and policy violations within the stockroom. (Fullum Dep. 66:11 – 67:10, 79:22 – 80: 12, 110:16 – 111:8; Harper Dep. 28:11 – 29:24, 31:8-11, 35:4-6).

23. Ms. Fullum and Mr. Harper received complaints about Plaintiff not staying on task and not completing his work or performing his job duties, Plaintiff consistently sitting at his desk

<div align="center">5</div>

or disappearing from his work station completely, Plaintiff taking extended breaks and returning smelling like cigarettes, Plaintiff being tardy for multiple shifts, and Plaintiff not training or listening to the employees assigned to train him.  (Harper Dep. 28:11 – 29:24, 31:8-11, 35:4-6, 37:5-7, 42:18-23, 43:22-25, 45:8-13, 103:19-23, 104:7-16; Fullum Dep. 65:16 – 66:1, 66:11 – 67:10, 68:4-7, 93:21-23).

24. By the start of his second week of employment, Plaintiff was moved to work in the dish washing area of the FANS department, because of the complaints regarding Plaintiff's work and the conduct that Ms. Fullum and Mr. Harper had witnessed. They had hoped that Plaintiff would perform better if moved to another area, so Plaintiff was assigned to train with a specific department employee -- James Scott.  But Plaintiff would not train with Mr. Scott and instead would talk to Arthur Moore. (Pl.'s Dep. 36:19-21; Harper Dep. 13:21 – 14:1, 35:19 – 36:12).

25. Ms. Fullum and Mr. Harper also witnessed Plaintiff's poor conduct, including sitting in another room instead of completing his duties, letting dishes pile up without washing them, taking multiple breaks and disappearing from his work station, and not taking direction from the tenured employees assigned to instruct and train him. Mr. Harper would not be able to locate Plaintiff at the start of his shifts, because Plaintiff was either tardy or would clock in and not be physically present within the department or his work station.  (Fullum Dep. 66:13 – 67:8, 79:22 – 80:12, 91:2 – 92:12; Harper Dep. 29:22-24, 37:5-7, 42:18-23, 43:22-25, 103:19-23, 104:7-16; Folsom Dep. 38:11-16, 40:22-24, 55:13-15).

26. During his employment with Tift, Plaintiff did not talk to Mr. Laub often, he would usually see Anthony Laub two times a week. (Pl.'s Dep.115:16-23, 119:14-16).

27. Anthony Laub did not give Plaintiff any counseling or disciplinary actions during Plaintiff's employment and did not terminate employees in the FANS department. (Pl.'s Dep. 121:7-9; Laub Dep. 36:2-3, 66:13-17; Fullum Dep. 58:17-25).

28. On February 25, 2019, Plaintiff alleged that Mr. Laub told him he needed to "work harder than a slave" and "outwork a Mexican." Plaintiff explained Mr. Laub was discussing with Plaintiff the importance of working harder and the work ethic needed to earn a supervisory role. (Pl.'s Dep. 39:24 – 40:1. 40:23 – 41:13; 46:6-9; 55:1-13, 55:17-19).

29. Plaintiff claims that his conversation with Mr. Laub did not last long, and Mr. Laub did not make the alleged the comment a demeaning manner. (Pl.'s Dep. 41:7-8, 60:15-18).

30. Plaintiff had never heard Anthony Laub make any racially offensive or derogatory comments to anyone at Tift, and Plaintiff did not tell Mr. Laub that the alleged comment was offensive to him. (Pl.'s Dep. 55:21-25, 122:21-24).

31. During his next break after the alleged conversation with Mr. Laub on the 25th, Plaintiff visited Human Resources ("HR") and met with Jasmine Thurston, the HR Generalist, to tell her about the alleged comment Anthony Laub made. Ms. Thurston documented the compliant in order to investigate. (Pl.'s Dep. 42:1-2, 42:14-25; Folsom Dep. 34:3-11, Exhibit 4).

32. Plaintiff did not see or speak to Anthony Laub after February 25, 2019. (Pl.'s Dep. 46:19-23, 59:7-15, 76:1-2, 122:10-20).

33. Plaintiff did not follow the call in policy when he was scheduled for his call in shift on February 27, 2019. (Pl.'s Dep. 35:4-18, 36:7-11, 136:7-9; Fullum Dep. 70:8-12, 70:23-24, Exhibit 22, 71:10-13, 74:6-10, 75:6-9, 82:4-5, Exhibit 11, 85:5-8; Harper Dep. 56:2-7).

7443963v.1

34. Plaintiff understood Defendant's call in policy and chose to violate it without any explanation. (Pl.'s Dep. 35: 4-18, 21-24; 39:17-18, 136:4-6).

35. Plaintiff admitted he violated the hairnet policy in the dish area one or two times. (Pl.'s Dep. 120:15-25).

36. During his first two weeks of employment, Plaintiff was late for his scheduled shifts several times. (Pl.'s Dep. 39:16-23; Fullum Dep. 65:16-17, 80:4-12, 93:18-23, 110:19-22; Folsom Dep. 38:3-14, 40:22-24; Harper Dep. 35:4-6, 42:18-23, 103:19-23, 104:7-16, 104:21-24).

37. While working in the dish area, Plaintiff worked alongside four African-American men. Most of the FANS department Assistants and cooks were African-American. (Pl.'s Dep. 36:24-25; Harper Dep. 14:10-14).

38. There were only five Caucasian employees working in the FANS department during Plaintiff's employment at Tift. (Pl.'s Dep. 135:17-20).

39. Plaintiff does not know of anyone else at Tift who was terminated for absenteeism or for not calling in or not showing up, Plaintiff does not know if anyone was not terminated at Tift for failure to call in, and Plaintiff does not know if anyone else at Tift has complained about racial comments. (Pl.'s Dep. 79:23 – 80:2-8).

40. During Ms. Fullum's employment as the FANS director, there were other employees who had performance issues in their first two weeks of employment, but those employees voluntarily resigned from their employment with Tift or were a no call/no show and did not return to work. (Fullum Dep. 111:9-14).

41. There are no other FANS employees that have demonstrated the same job performance issues and policy violations as Plaintiff in the first two weeks of their employment. (Folsom Decl. ¶16).

7443963v.1

42. At the time of Plaintiff's employment and throughout the remainder of 2019, there were fifty-nine (59) employees employed in the FANS department; sixty-six percent (66%) of those employees were African-American. (Fullum Dep. 43:7-8, Exhibit 21; Folsom Decl. ¶17).

<div align="center">Plaintiff's Termination from Tift</div>

43. Kelly Fullum made the decision to terminate Plaintiff and recommended his termination to Alex Le, the Vice President and Chief Operating Officer. Alex Le approved Ms. Fullum's decision to terminate Plaintiff. (Fullum Dep. 85:9-19; Folsom Dep. 59:14-17; Folsom Decl. ¶12).

44. Kelly Fullum terminated Plaintiff on March 1, 2019. (Pl.'s Dep. 49:10-13, 76:22-24; Fullum Dep. 64:7-10, 69:16-25, 72:7-9, 76:7-8, Exhibit 10, 82:4-5, Exhibit 11, 120:14-19; Harper Dep. 64:12-16; Folsom Dep. 48:2).

45. March 1, 2019 was Plaintiff's next scheduled shift to work after his failure to call in on the 27th. (Fullum Dep. 76:7-8, Exhibit 10, 70:23-24, Exhibit 22).

46. Plaintiff was notified by Kelly Fullum that he was terminated due to his poor work ethic and poor work performance. (Pl.'s Dep. 43:19-20, 44:8-9, 52:18-19; Fullum Dep. 65:13 – 66:1, 67:5-10, 69:20-25, 82:4-5, Exhibit 11, 118:22-24).

47. Anthony Laub was not in the office when Plaintiff was terminated and Anthony Laub did not terminate Plaintiff. (Pl.'s Dep. 121:20-22; Fullum Dep. 58:17-25; Laub Dep. 66:8-17).

48. Plaintiff does not believe Kelly Fullum terminated him because of his race. (Pl.'s Dep. 76:25 – 77:2).

<div align="center">*** SIGNATURE ON FOLLOWING PAGE ***</div>

7443963v.1

Respectfully submitted this 18th day of June 2021.

<div style="margin-left: 50%;">

CONSTANGY, BROOKS, SMITH
& PROPHETE, LLP

/s/ Alyssa K. Peters
ALYSSA K. PETERS
Georgia Bar No. 455211

</div>

577 Mulberry Street, Suite 710
P.O. Box 1975
Macon, GA 31202-1975
(478) 750-8600
(478) 750-8686 (facsimile)
apeters@constangy.com

7443963v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I have filed the foregoing DEFENDANT'S STATEMENT

OF UNDISPUTED MATERIAL FACTS with the Clerk of Court using the CM/ECF system which

will automatically send email notification of such filing to the following attorneys of record:

Eleanor Mixon Attwood
Legare, Attwood & Wolfe, LLC
125 Clairemont Avenue
Suite 380
Decatur, GA 30030
emattwood@law-llc.com

This 18th day of June, 2021.

                                    CONSTANGY, BROOKS, SMITH
                                    & PROPHETE, LLP

                                    /s/ Alyssa K. Peters
                                    ALYSSA K. PETERS
                                    Georgia Bar No. 455211

577 Mulberry Street, Suite 710
P.O. Box 1975
Macon, GA 31202-1975
(478) 750-8600
(478) 750-8686 (facsimile)
apeters@constangy.com

7443963v.1